

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

12/23

CORINA M. PIERCE
4294 BROOKLANDS DR
HILLIARD, OH 43026,

PLAINTIFF,

VS.

VILLAGES OF BRITTON LTD
4115 BRITTON PARKWAY
HILLIARD, OH 43026,

DEFENDANT.

20CV-11-7238
CASE NUMBER

**** SUMMONS ****          11/06/20

2020 NOV 12 PM 1:40
FRANKLIN COUNTY SHERIFF

TO THE FOLLOWING NAMED DEFENDANT:
VILLAGES OF BRITTON LTD
4115 BRITTON PARKWAY
HILLIARD, OH 43026

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY
COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY:     CORINA M. PIERCE
        4294 BROOKLANDS DR
        HILLIARD, OH 43026,

                                        PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF
THE PLAINTIFF'S ATTORNEY IS:
        CORINA M. PIERCE
        4294 BROOKLANDS DR
        HILLIARD, OH 43026

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S
ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY
OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE
OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER
MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A
COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY:  BROOKE ELLIOTT, DEPUTY CLERK

                                        (CIV370-S03)



MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

JUDGE D. HAWKINS

CORINA M. PIERCE,

       PLAINTIFF,

    VS.

                   **20CV-11-7238**
                    **CASE NUMBER**

VILLAGES OF BRITTON LTD
ET. AL.,

       DEFENDANT.

CLERK'S ORIGINAL CASE SCHEDULE
-------------------------------

|  | LATEST TIME OF OCCURRENCE |
|---|---|
| CASE FILED | 11/06/20 |
| INITIAL STATUS CONFERENCE | ******** |
| INITIAL JOINT DISCLOSURE OF ALL WITNESSES | 03/26/21 |
| SUPPLEMENTAL JOINT DISCLOSURE OF ALL WITNESSES | 05/21/21 |
| DISPOSITIVE MOTIONS | 08/13/21 |
| DISCOVERY CUT-OFF | 08/27/21 |
| DECISIONS ON MOTIONS | 10/08/21 |
| FINAL PRE-TRIAL CONFERENCE/ORDER (OR BOTH) | 10/25/21 0900AM |
| TRIAL ASSIGNMENT | 11/22/21 0900AM |

NOTICE TO ALL PARTIES
---------------------

    ALL ATTORNEYS AND PARTIES SHOULD MAKE THEMSELVES FAMILIAR WITH THE
COURT'S LOCAL RULES, INCLUDING THOSE REFERRED TO IN THIS CASE SCHEDULE.
IN ORDER TO COMPLY WITH THE CLERK'S CASE SCHEDULE, IT WILL BE NECESSARY
FOR ATTORNEYS AND PARTIES TO PURSUE THEIR CASES VIGOROUSLY FROM THE DAY
THE CASES ARE FILED. DISCOVERY MUST BE UNDERTAKEN PROMPTLY IN ORDER TO
COMPLY WITH THE DATES LISTED IN THE RIGHT-HAND COLUMN.

                        BY ORDER OF THE COURT OF COMMON PLEAS,
                        FRANKLIN COUNTY, OHIO

_/__/__
DATE

                        MARYELLEN O'SHAUGHNESSY, CLERK

                                              (CIV363-S10)

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO
CIVIL DIVISION

**CORINA M. PIERCE**
4294 Brooklands Drive
Hilliard, Ohio 43026

    Plaintiff,

    v.

**VILLAGES OF BRITTON, LTD**
*(doing business as LC Hilliard)*
4115 Britton Parkway
Hilliard, Ohio 43026

**NICOLE LOY**
*Address currently unknown*

**BROAD & JAMES TOWING**
4301 E. 5th Avenue
Columbus, Ohio 43219

    Defendants.

**CASE NO.:**

**JUDGE:**

**JURY DEMAND**

Plaintiff **CORINA M. PIERCE** (hereinafter "Plaintiff"), pro se, as and for her

**VERIFIED COMPLAINT** in this action against Defendants **VILLAGES OF BRITTON,**

**LTD.** (hereinafter "Villages of Britton"); **NICOLE LOY** (hereinafter "Loy"), individually and

in her official capacity; and **BROAD & JAMES TOWING** (hereinafter "BJ Towing"), and

("collectively, **DEFENDANTS**"), hereby alleges as follows:

1

Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Nov 06 2:36 PM-20CV007298

### NATURE OF THE CLAIMS

1. This is an action for declaratory, injunctive, and equitable monetary relief from these practices; compensatory and punitive damages; and an award of costs and expenses, to redress Defendants' unlawful discriminatory treatment against Plaintiff due to her race, sex, and familial status, along with its unlawful retaliation against her after she complained about unlawful discrimination in violation of the Federal Fair Housing Act, 42 U.S.C. §§3601 *et seq.* and the State of Ohio's Fair Housing Act, Ohio Revised Code §§4112.02 *et seq.* Moreover, this case will address the recovery for the loss and damage of property and the intentional infliction of emotional distress.

### JURISDICTION AND VENUE

2. Jurisdiction and venue are proper in this Court pursuant to Ohio Civ. R. 3(C)(2),(3),(5) and (6), in that Defendants have its principal place of business in Franklin County and Franklin County is the county in which Defendants conducted activities that gave rise to the claims for relief. Furthermore, the property which is the subject of the action was situated in Franklin County.

### PARTIES

3. Plaintiff, Corina M. Pierce, is a Black woman, and mother of minor children. Plaintiff resides at Lifestyle Communities Hilliard (LC Hilliard), situated in Franklin County, Ohio.

4. Upon information and belief, Defendant Villages of Britton, LTD. ("Villages of Britton") is a landlord that manages and leases LC Hilliard.

5. Upon information and belief, Defendant Nicole Loy ("Loy"), a White woman, is the leasing manager at Villages of Britton.

6. Defendant Broad & James Towing ("BJ Towing") is a towing company in Franklin County, Ohio.

## STATEMENT OF FACT

7. On or about August 15, 2014, Plaintiff executed a written lease agreement with Villages of Britton to reside at LC Hilliard.

8. Due to the Covid-19 pandemic, in March 2020, the parties agreed to convert to a month-to-month lease, after Plaintiff's written lease expired on September 30, 2020, which a true and accurate copy of Plaintiff's lease is attached hereto as **Exhibit 1**.

9. When the new leasing manager arrived in late March 2020, Defendant Nicole Loy, discriminatory and retaliatory actions were taken against Plaintiff and her family.

10. On or about May 19, 2020, Plaintiff's husband visited the offices of the Defendant to pick up a package that was addressed to him. During his visit he was harassed and racially profiled by Loy. Plaintiff reported the incident to the Village of Britton's corporate office.

11. On June 16, 2020, Plaintiff saw LC Hilliard's maintenance worker place a large orange violation sticker on her 2008 Ford Escape. When Plaintiff questioned the agent, she learned that the property manager, Defendant Loy, instructed him to place the violation sticker on the car because it had an expired registration tag, and the vehicle was too unattractive to be parked near the restaurant.

12. Approximately twenty (20) minutes after the speaking with the LC Hilliard agent, Plaintiff visited the Bureau of Motor Vehicles ("BMV") in Hilliard, Ohio to resolve the expired registration tag issue.

13. After Plaintiff placed the updated tag on her vehicle, the LC Hilliard maintenance worker removed the orange violation sticker from the 2008 Ford Escape.

3

14. The following day, on June 17, 2020, Plaintiff traveled from Hilliard, Ohio to Miami, Florida.

15. Upon Plaintiff's return home, on June 25, 2020, she noticed that her 2008 Ford Escape was missing.

16. Plaintiff learned that Defendant Loy initiated the tow of her vehicle, without justification.

17. On June 18, 2020, Defendant BJ Towing, at the demand of Loy, towed Plaintiff's vehicle from LC Hilliard to BJ Towing's storage facility.

18. Plaintiff's vehicle was lawfully registered, mobile, and not in violation of her signed lease agreement with the LC Hilliard.

19. Yet, Loy refused to have Plaintiff's vehicle returned.

20. Because Plaintiff knew that at least three White residents stored their immobile vehicles at LC Hilliard but were not towed or in violation of their lease agreement, coupled with the incidents involving Loy and Plaintiff's husband a few weeks prior, she filed a charge of discrimination with the United States Department of Housing and Urban Development ("HUD") on June 30, 2020.

21. Plaintiff continued to plead with Loy to have her car returned, informing Loy that she has filed a charge with HUD, to no avail. It was at this juncture that Defendants were made aware of the charge filed with HUD.

22. On July 15, 2020, Plaintiff's husband sent to Defendants an email requesting a meeting with its "District Manager and/or Legal Counsel" to discuss what he believed was discrimination and harassment.

23. Twelve (12) days after Plaintiff's husband's email was sent to Defendants, Loy issued to Plaintiff a notice for Nonrenewal of the lease.

24. Plaintiff responded to Loy's Nonrenewal notice, by requesting to pay on a *month-to-month* basis as was agreed upon in March 2020, however Loy rejected the option.

25. On September 26, 2020, Plaintiff called BJ Towing to inquire about the total cost to pick up her vehicle. A BJ Towing representative, Ms. Samantha, informed Plaintiff that she must pay $1,993.05 to have her vehicle released. However, several hours later, the BJ Towing's Title Clerk, a Mr. Jeremy Burgin ("Burgin"), contacted Plaintiff by telephone. Burgin informed Plaintiff that her vehicle was already scrapped and not available for pick-up. Burgin sent Plaintiff an email confirming the same. A true and accurate copy the email communication between Plaintiff and BJ Towing's Title Clerk is attached hereto as **Exhibit 2**.

26. Plaintiff was terribly sad and upset. The vehicle and all her family's personal belongings were destroyed due to Loy's and BJ Towing's actions.

27. Plaintiff requested a complete copy of her file with BJ Towing, including pictures of her vehicle. Unfortunately, BJ Towing denied the request for a copy of the file with pictures.

28. BJ Towing provided to Plaintiff a copy of a "*First Notice*" letter, dated June 19, 2020, which was sent to the incorrect physical address. However, BJ Towing was in possession of Plaintiff's correct address as of June 26, 2020. A true and accurate copy of BJ Towing's "First Notice" is attached to this complaint as **Exhibit 3**.

29. Plaintiff has learned that Loy's reason for towing Plaintiff's vehicle and issuing the nonrenewal notice was based on her race and familial status.

30. Loy treats residents less favorably if they are Black and have minor children. For example, Loy allowed a White man, who is not a resident of LC Hilliard, to store his immobile vehicle on property for several months without issue. The immovable vehicle's, which had flat and

rotten tires, registration tag expired, but remained on property without any violations from Loy. Additionally, Loy granted access to the community amenities to several White college athletes that do not reside at LC Hilliard. Loy does not allow Plaintiff to enjoy the same benefits and privileges as her White neighbors.

31. In mid-September 2020, Plaintiff informed Loy that her neighbors, residing at 4290 Brooklands Drive, Hilliard, Ohio 43026, use and sell illegal drugs. Additionally, Plaintiff reported to LC Hilliard that the neighbors continue to use racial epithets directed to Black residents. Plaintiff provided to Loy a copy of surveillance footage that captures the illegal activity. Due to the neighbors and their visitors inebriated state, they have frequently attempted to enter Plaintiff's home, apparently mistaken Plaintiff's unit as their own.

32. Loy refused to investigate or resolve the health and safety issue.

33. On September 28, 2020, Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC") due to Loy's (i) refusal to renew Plaintiff's lease, (ii) rejection of her request to rent month-to-month, (iii) failure to have her vehicle returned, and (iv) failure to resolve the health and safety issues with her neighbor.

34. On October 11, 2020, Plaintiff, again requested from BJ Towing, via email, a complete copy of her file including any pictures taken of her vehicle during the towing incident.

35. BJ Towing ignored Plaintiff's request.

36. On October 14, 2020, Plaintiff visited BJ Towing. BJ Towing finally released images taken of the 2008 Ford Escape prior to the tow, excluding the date and time that the images were captured.

37. The images taken by BJ Towing clearly illustrate that Plaintiff's vehicle was properly parked and legally registered. A true and accurate copy of the photo taken by BJ Towing prior to the tow is attached hereto as **Exhibit 4**.

38. Defendant Villages of Britton (LC Hilliard) filed a complaint for Forcible Entry & Detainer, *Franklin County Municipal Court case no. 2020 CVG 025936*, on October 14, 2020, alleging the Plaintiff is a "*holdover tenant*".

39. After making a Public Records Request, on October 19, 2020, for the records relating to the towing of her vehicle, Plaintiff learned that BJ Towing failed to send the notice, as required by 4513.601(F)(1). The Ohio BMV lists Plaintiff's last known address as 4294 Brooklands Drive, Hilliard, Ohio 43026. Attached to this compliant as **Exhibit 5** is a true and accurate copy of Plaintiff's vehicle registration renewal form.

40. Upon learning of Plaintiff's complaints of discrimination and initiation of the HUD Charge, Defendant Villages of Britton and Loy continued their engagement in a pattern of discriminatory and retaliatory behaviors directed toward Plaintiff and her family. Such unlawful behaviors began in May 2020 and has been continuous, and is highlighted by Loy's malicious act of harassing Plaintiff about other Black visitors use of amenities (May 2020), towing Plaintiff's lawfully parked vehicle (June 2020), issuance of a notice of non-renewal of lease during a pandemic (July 2020), breaching the agreement to a month-to-month lease (August 2020), refusal to put an end to the neighbors' behaviors, and the eviction action (October 2020).

41. In response to these additional unlawful behaviors, Plaintiff filed a Charge with OCRC. The OCRC's investigation is pending as of the filing of this complaint.

7

42. In *Franklin County Municipal Court case no. 2020 CVG 025936*, Plaintiff filed her answer, defenses, and counterclaims on October 21, 2020, alleging, in part, that the eviction action is "invalid and is not of legal effect" because Villages of Britton is "attempting to intimidate and retaliate against [Defendant] by means of action under color of law, and to prevent her from exercising her constitutional rights". Moreover, Plaintiff filed with the Honorable Municipal Court a *Motion to Transfer to Common Pleas Court*, based on the monetary value of her Counterclaims demand. The Motion to Transfer is pending before the Municipal Court. The Municipal Court dismissed Plaintiff's Counterclaims because of lack of jurisdiction. A true and accurate copy of the Court's Entry dismissing Plaintiff's Counterclaims because of lack of jurisdiction is attached hereto as **Exhibit 6**.

<u>COUNT 1</u>
(DISCRIMINATORY PRACTICES)

43. Plaintiff repeats and re-alleges and incorporates by this reference the allegations set forth in paragraph 1 through 42, inclusive, as though fully set forth herein.

44. Defendants violated the Federal Fair Housing Act, 42 U.S.C. §§3601 *et seq.* and the State of Ohio's Fair Housing Act, Ohio Revised Code §§4112.02 *et seq.*

45. Plaintiff is within the protected class of persons under 42 U.S.C. §§3601 and O.R.C. §§4112.02 as a Black woman with minor children, and therefore enjoys the rights provided under each provision.

46. Pursuant to 42 U.S.C. §3604(a)(b) and O.R.C. §4112.02, Defendant Villages of Britton, in its capacity as landlord, is strictly prohibited from discriminating against Plaintiff on the basis of her race, sex, and familial status.

47. Defendant violated 42 U.S.C. §3604 and O.R.C. §4112.02 by discriminating against the Plaintiff regarding the terms, conditions, and privileges of rental of a dwelling, and in the provision of services and facilities, based on her race, sex, and familial status.

48. Defendant violated U.S.C. §3604 and O.R.C. §4112.02 by (1) unlawfully towing Plaintiff's mobile vehicle, (2) harassing Plaintiff about "Black" visitors' use of facilities, (3) refusing to renew Plaintiff's lease agreement, (4) allowing a health & safety concern to continue that adversely effects the Plaintiff, and (5) initiating an eviction against Plaintiff. But for Plaintiff's race, sex, and familial status Defendant would have treated her similarly to other residents.

49. As a result of the conduct or actions of the Defendants, Plaintiff has suffered damages and he is an aggrieved person within the meaning of 42 U.S.C. §3602(i). The discriminatory conduct or actions of the Defendants were intentional, willful, and taken in disregard for the rights of Plaintiff.

50. Defendant has both economically and emotionally damaged the Plaintiff in a sum to be determined at Trial.

## COUNT 2
### (RETALIATORY BEHAVIORS / RETALIATORY EVICTION)

51. Plaintiff repeats and re-alleges and incorporates by this reference the allegations set forth in paragraph 1 through 50, inclusive, as though fully set forth herein.

52. Pursuant to 42 U.S.C. §3617 and O.R.C. 4112.02(H)(12), it is unlawful for Defendants to coerce, intimidate, threaten, or interface with any person on account of his or her having aided or encouraged any other person in the exercise or enjoyment of their rights under those titles.

53. Accordingly, Plaintiff is to be free from any coercion, intimidation, threats, and/or interference on the part of Defendant, including retaliatory behavior for; (1) filing a Charge with the United States Department of Housing and Urban Development ("HUD") in June 2020 against Plaintiff and (2) filing a Charge with the Ohio Civil Rights Commission ("OCRC") in September 2020.

54. Defendant violated 42 U.S.C. §3617 and O.R.C. 4112.02(H)(12) by engaging in retaliatory behaviors after learning of Plaintiff's and her husband's complaints of discrimination and OCRC Charge. Defendants' behaviors include: (1) unlawfully towing Plaintiff's mobile vehicle, (2) harassing Plaintiff about other Black visitors' use of facilities, (3) refusing to renew Plaintiff's lease agreement, and (4) allowing a health & safety concern to continue that adversely effects the Plaintiff.

55. Defendant engaged in all of these behaviors after learning of Plaintiff's complaints to Defendant's corporate office and receiving Plaintiff's husband's complaint alleging discrimination. Defendants did not engage in these behaviors prior to such knowledge.

56. Additionally, Defendant issued the notice of nonrenewal of lease and instituted an action for eviction in retaliation for Plaintiff's complaints of discrimination, thereby violating 42 U.S.C. §3617 and O.R.C. 4112.02(H)(12).

57. The timing in which Defendants issued the nonrenewal of lease relative to its discovery of Plaintiff's and her husband's complaints of discrimination is unequivocal evidence of retaliatory behavior.

58. Although the OCRC is completing its investigation, Defendant's reason for the adverse actions taken against Plaintiff continues to change.

59. Plaintiff is being denied the opportunity to renew her lease and the right to enjoy the same privilege as other White residents based upon her protected complaints and Defendant Loy's personal feelings about Black residents.

60. Defendants have violated federal and state laws with knowing and reckless disregard of the statue's proscriptions.

61. Defendant has damaged Plaintiff in a sum to be determined at Trial.

62. Plaintiff is entitled to recover her actual damages for breach of these duties in a sum to be determined at trial.

### COUNT THREE
(DAMAGE TO PROPERTY – O.R.C. 2305.10)
Recovery of the Value of Personal Property Destroyed

63. Plaintiff repeats and re-alleges and incorporates by this reference the allegations set forth in paragraph 1 through 62, inclusive, as though fully set forth herein.

64. Defendants intentionally or recklessly caused for Plaintiff's vehicle to be towed and scrapped, without justification.

65. Plaintiff's vehicle and all property contained in it was destroyed due to the actions of the Defendants.

66. Plaintiff was damaged by Defendants' actions, in an amount to be determined at trial.

### COUNT FOUR
(INTENTIONAL AND/OR RECKLESSNESS
INFLICTION OF EMOTIONAL DISTRESS)

67. Plaintiff repeats and re-alleges and incorporates by this reference the allegations set forth in paragraph 1 through 66, inclusive, as though fully set forth herein.

68. Defendants intended to cause Plaintiff serious emotional pain. Defendants' intentional acts that caused for Plaintiff's vehicle to be towed, then scrapped is beyond disgraceful.

11

69. Defendants' conduct relating to the towing of Plaintiff's vehicle, harassment, issuance of the non-renewal notice, and the other actions taken based on race and in retaliation for Plaintiff's protected complaints has caused her great harm, in an amount to be proven at trial.

## COUNT FIVE
### (VIOLATIONS OF O.R.C. 4513.60 & 4513.601)

70. Plaintiff repeats and re-alleges and incorporates by this reference the allegations set forth in paragraph 1 through 69, inclusive, as though fully set forth herein.

71. Defendant BJ Towing failed to record the date and time of the photos taken of Plaintiff's vehicle prior to being towed. BJ Towing failed to show Plaintiff all photographs taken of her vehicle as required under division (D)(1) of O.R.C. 4513.601.

72. Defendant BJ Towing failed to send notice to the Plaintiff as required by section 4513.601 of the Revised Code.

73. Defendant BJ Towing failed to allow Plaintiff to retrieve her personal items from her 2008 Ford Escape as required under division (G)(4) of section 4513.601 of the Revised Code.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff seeks a judgement against Defendants and her prayer for relief is as follows:

74. That the Court declare the actions of Defendants complained of by Plaintiff herein to be in violation of Federal and State Fair Housing Laws.

75. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

76. An award of damages, as to each count; plus prejudgment interest, in actual, compensatory, and punitive damages in an amount that exceeds Twenty-Five Thousand Dollars

($25,000.00), the exact amount to be determined at trial, along with reasonable attorney fees if one is retained, and cost incurred in this matter.

77. Plaintiff prays that the Court award such other and further relief as this Court deems equitable and just.

Dated this 6th day of November 2020.

Respectfully Submitted,

*Corina Pierce*

Corina M. Pierce, Plaintiff
4294 Brooklands Drive
Hilliard, Ohio 43026
404-547-1913

This **Verified Complaint**, including the six (6) referenced Exhibits that are attached hereto is **sworn to and subscribed before me this 6th day of November, 2020**.

My commission expires: 4-2-24

NOTARY PUBLIC

WILLIAM W COX
Notary Public, State of Ohio
My Comm. Expires 4-2-24
Recorded in Franklin County

CORINA M. PIERCE

## CERTIFICATE OF SERVICE

I, Corina M. Pierce, hereby certify that the foregoing was served upon all parties by certified mail.

Dated: November 6, 2020

Corina M. Pierce, Plaintiff
4294 Brooklands Drive
Hilliard, Ohio 43026

# LEASE AGREEMENT

THIS LEASE AGREEMENT (hereinafter referred to as the "Lease") is made ▓▓▓▓ by and between ▓▓▓▓▓▓▓▓ c/o Lifestyle Property Management, Ltd., 230 West Street, Suite 200, Columbus, Ohio 43215 (hereinafter referred to as "Landlord") and ▓▓▓▓▓▓ (hereinafter referred to collectively and severally as "Tenant"). In the event there is more than one Tenant, the covenants and conditions in this Lease shall bind all of Tenants, jointly and severally.

I. **PREMISES LEASED.** Landlord, in consideration of the Rent (as hereinafter defined) to be paid, and covenants agreements to be performed by Tenant does hereby lease the following described Premises known as ▓▓▓▓, (or ▓▓▓▓▓▓▓▓▓▓ Drive) in the ▓▓▓▓▓ ("Apartment Community") located at: ▓▓▓▓▓▓▓▓▓▓, HILLIARD, OH, ▓▓▓▓ ("Premises"), to be used and occupied solely by Tenant, and such other persons as are named in PARAGRAPH IV- OCCUPANCY of this Lease.

II. **LEASE TERM.** Tenant agrees to occupy Premises for an original term commencing ▓▓▓▓▓▓ ("Lease Start Date") and ending ▓▓▓▓▓▓ ("Lease Term"). The term "Lease Term" as used herein, shall include each holdover tenancy, renewal or extension of the initial term of this Lease. This Lease and all terms and covenants shall automatically and continually renew on a month-to-month basis unless notice is given as stated in PARAGRAPH VII- MOVE OUT NOTICE AND RENEWAL.

III. **RENT.** Tenant agrees to pay as rent for the Premises the total sum of $17,212.00 at a rate of $1,324.00 per month (hereinafter "Base Rent"), without demand, at the manager's office located in the Apartment Community. In the event that the Lease Start Date is not the first day of a month, Tenant shall be required to pay a prorated rent in advance in the amount set forth on the Initial Month Rent Prorate Addendum attached hereto and included herein. In addition to the Base Rent, Tenant shall be required to pay additional rent, if any, set forth in PARAGRAPH VIII, PARAGRAPH IX, and the Pet Consent Agreement, if applicable, and elsewhere in this Lease (hereinafter "Additional Rent"). The Base Rent and the Additional Rent shall hereinafter be referred to herein as the "Rent". Except as expressly provided otherwise in this Lease, payment of all Rent must be made by one of the following methods: (a) personal bank check, which check may be converted to an electronic transaction, (b) auto-check or other automatic payment method accepted by Landlord, (c) on-line bill payment systems accepted by Landlord, (d) certain major credit cards approved from time to time by Landlord and provided that Tenant shall be responsible for payment of all fees and transaction charges associated with the payment by credit card. Cash payment of rent will not be accepted without Landlord's prior consent. In the event that there is more than one Tenant, Landlord shall not be required to accept multiple payments of Rent and may require that a single payment be made. Notwithstanding the foregoing, in the event Landlord elects to accept payment of Rent from more than one Tenant, failure of any Tenant to make payment shall result in a default and shall not release any Tenant from their joint and several liability hereunder for the payment of the full amount of Rent due hereunder.

**ALL RENT IS DUE ON OR BEFORE THE FIRST DAY OF EACH MONTH** ("Rent Due Date"). A late fee in the amount of $125.00 will be assessed to your rental account if not paid in full and received by Landlord at the property manager's office at the Apartment Community on or before the 5th day of the month due. If your rental account is not paid in full by the 10th day of the month, an additional late fee in the amount of $125.00 will be assessed and added to the outstanding account balance. Delinquent Rent is subject to legal action without prior notice.

Any rent received shall be applied to any past due amounts and any remainder applied to the current rent account balance due. If payment of Rent is made by a check or other means that is returned, Tenant agrees to pay to Landlord a charge of $30.00 per returned item, in addition to the initial and daily late charges, if applicable. Landlord may, at any time require that all future Rent and other sums be paid either by certified check, cashier's check, or money order. Cash payment of Rent will not be accepted without Landlord's prior consent. Tenant agrees further that acceptance and/or refusal by Landlord of the Rent payment after the Rent Due Date shall in no manner constitute a waiver of Landlord's rights in the event of Tenant's failure to make rental payments as herein prescribed and agreed, nor shall it be considered as a change in the Rent Due Date upon which Tenant is to pay said Rent. Failure to demand the Rent when due shall not constitute a waiver by Landlord, and the necessity of demand for the Rent by Landlord when the Rent is overdue, is hereby waived. Landlord agrees to notify Tenant, in writing, at least sixty (60) days prior to the expiration of the initial Lease Term, or the expiration of any renewal or extension thereof, including any extension resulting from a holdover tenancy, of any increase in the Rent charged for occupancy of the Premises. Notwithstanding the foregoing, for any holdover tenancy, unless otherwise agreed to in writing signed by Landlord, Base Rent shall automatically increase to Current Market Rent plus a fee in the amount of $200.00 per month.

IV.**OCCUPANCY.** Tenant agrees that only those persons listed below shall occupy the Premises.

Name: ▓▓▓▓▓▓      Date of birth: ▓▓▓▓▓▓





*Ex.1*

No person shall be released from the covenants of this Lease without first obtaining the written agreement of the other Tenants and/or co-signers set forth herein and written approval of changes from Landlord. If such changes are agreed upon, all parties herein agree to make the necessary changes to this Lease in writing before changes are valid.

Tenant agrees that the Premises are to be occupied for residential purposes only. The Premises shall not be used or allowed to be used for any unlawful purposes, or for any purposes deemed hazardous by Landlord because of fire or any other risk or in any other manner which would disturb the peaceful,

use or other illegal activities in connection with controlled substances. A criminal conviction shall not be necessary before Landlord can institute an eviction action.

**V. SECURITY DEPOSIT.** Tenant agrees to deposit with Landlord the sum of $̶ ("Deposit") as security for Tenant's faithful performance under the terms and conditions of this Lease and under all applicable laws, rules and regulations. Tenant agrees the Deposit is not an advance payment of Rent and does not relieve the obligation of Tenant to pay Rent including Rent for the last month of occupancy. Landlord, at expiration of this Lease or any hold-over tenancy, may apply the Deposit for the past due Rent, fees, utilities, and /or for the cost of repairing damages beyond reasonable wear and tear to the Premises caused by Tenant, Tenant's guests or occupants. Also, abandonment or vacating of the Premises by Tenant before the end of this Lease Term of this Lease shall result in Landlord deducting damages Landlord has incurred as a result of Tenant's action from the Deposit. Each Tenant (if more than one) shall be jointly and severally responsible for all losses incurred by Landlord occasioned by the tenancy. Tenant agrees to provide Landlord, in writing, a forwarding address upon vacating the Premises. Landlord agrees to return to Tenant the Deposit or whatever part has not been applied in payment of any Tenant obligations under this Lease, within 60-days after the expiration or any renewal of this Lease and delivery of possession of the Premises to Landlord, whichever is last to occur. This provision does not waive rights of Landlord to seek damages in excess of the Deposit. Tenant agrees to reimburse Landlord for any Rent, fees, utilities due and/or damages exceeding the amount of the Deposit. Tenant hereby authorizes Landlord to deposit the Deposit required by this Lease in an interest-bearing account in any bank, savings and loan association, credit union or elsewhere as permitted by applicable law. Interest earned may be disbursed to Landlord, except interest required by applicable law to accrue to the benefit of Tenant. Tenant agrees to pay a one-time non-refundable lease administration fee of $100.00 at the time of move-in, which does not apply to renewal lease terms.

**VI.KEYS.** Tenant will be provided two apartment key(s) per adult, one mailbox keys(s), and if applicable, one garage door key per adult, one garage door opener(s) per garage door, and one mobile access control pass per Tenant. There will be a Forty-Five Dollar ($45.00) re-keying fee or replacement fee assessed for any keys/openers that are lost, damaged or not returned upon vacating. In the event the Tenant is locked out of the Premises after 6:00 PM, the Tenant will be charged a twenty-five dollar ($25) service call fee to unlock the door of the Premises.

**VII.    MOVE OUT NOTICE AND RENEWAL.** Unless (a) this Lease is renewed in writing signed by Landlord and Tenant, (b) Landlord and Tenant execute a new Lease, or (c) written notice of termination is given by Landlord or Tenant to the other at least sixty (60) days before the expiration date of this Lease, this Lease shall be automatically and continually renewed on a month to month basis. At any time after the expiration of the initial Lease Term, Tenant must provide Landlord written notice of intent to move at least thirty (30) days prior to the next applicable Rent Due Date. Tenant's move-out may not terminate this Lease sooner than the end of this Lease Term or any applicable renewal period. Tenant's move out notice must terminate this Lease on the exact day designated in the move-out notice but no sooner than thirty (30) days prior to the next applicable Rent Due Date after the notice. Verbal notice of the intent to vacate the Premises is not sufficient and will be not accepted as proper notice. Tenant may obtain a written move out notice form from the property manager's office located at the Apartment Community.

**VIII.    UTILITIES.** Tenant shall pay for trash removal. Tenant agrees to pay a monthly charge for door-to-dumpster trash transport service ("Trash Transport") on Tenant's utility bills. Tenant may make a written request for a cost estimate of Trash Transport from the Apartment Community property manager, though the actual cost may differ from the estimate. Landlord reserves the right to cancel or suspend Trash Transport at any time. The cost of Trash Transport may change from time to time. Tenant shall be responsible for all other utilities and services to the Premises and as set forth in this Lease. Tenant agrees to place all utilities for which Tenant is responsible in Tenant's name(s) prior to receiving occupancy of the Premises. Tenant agrees to pay all utilities, related deposits and charges on Tenant's utility bills. Tenant shall not allow utilities, other than cable TV, to be disconnected by any means (including nonpayment of bill) until the end of this Lease Term or any applicable renewal period. Tenant shall immediately notify Landlord of any notice Tenant receives concerning the non-payment of any utility bills during this Lease Term and any renewal period. Tenant agrees to reimburse Landlord for any utility bills paid by Landlord during the period that Tenant is responsible for such utilities under the terms of

ep

this Lease. Tenant agrees to make such reimbursement within two (2) working days of receiving demand for payment from Landlord. Utilities shall be used only for normal household purposes and not wasted. Notwithstanding anything to the contrary contained herein, Tenant agrees that Landlord shall arrange to have an electric and water meter installed to measure Tenant's electric and water usage. Landlord, or a service provider selected by Landlord, shall supply Tenant with information of the cost per unit of electricity or water consumed and the number of units consumed. Rates charged per unit of water and electricity consumed shall be comparable in cost per unit charged by regulated utilities in the general area of the Apartment Community. Tenant further agrees to pay for such electricity and water usage, based upon their actual metered usage plus an allocation of common area use, or apportioned usage, if the utility use is provided in the aggregate for multi-family units. Billing for electric and water usage and Trash Transport shall be considered Additional Rent although it will be separately billed and collected. It is understood and agreed between Landlord and Tenant that in the event such payments are not made when due, it shall be considered substantial default under this Lease, and Tenant agrees that Landlord, or a service provider selected by Landlord, may bring summary proceedings for collection and/or eviction. NONPAYMENT OR DISCONNECTION OF THE ELECTRIC, GAS, WATER OR TRASH SERVICE WILL BE CONSIDERED MATERIAL NONCOMPLIANCE UNDER PARAGRAPH XVI - LEASE COMPLIANCE, AND MAY RESULT IN LEGAL ACTION AGAINST TENANT.

**IX. PETS.** There shall be no dogs, cats, or pets of any kind permitted in, on, or about the Premises, or adjoining common areas (even temporarily), unless Landlord's written consent is given in pursuant to a fully executed Pet Consent Agreement ("Pet Consent Agreement") attached to this Lease and incorporated herein. In the event a pet is in the Premises at any time during Tenant's term of occupancy (with or without Landlord's consent), a charge may be made for de-fleaing, deodorizing, and/or shampooing, and/or other damages caused by the pet. In the event Landlord discovers a pet in the Premises during this Lease Term, in addition to all other rights and remedies available to Landlord for default by Tenant under the terms of this Lease, Landlord shall assess, as Additional Rent, a monthly pet violation fee in the amount of Fifty Dollars ($50.00) per month for the remainder of this Lease Term or until Landlord is satisfied that the pet is no longer in the Premises. Tenant understands that if Tenant acquires a pet during Tenant's occupancy, Tenant must obtain the prior written consent of Landlord and Tenant and enter into Pet Consent Agreement. Amounts due under the Pet Consent Agreement shall be considered "Additional Rent" under the terms of this lease.

**X. INSURANCE.** Tenant will be responsible for insuring all of Tenant's property within the Premises. Tenant agrees to purchase and have in place a renter's insurance policy (with a waterbed clause if applicable to Tenant's occupancy), and Tenant hereby relieves Landlord of all risks that can be insured thereunder. Proof of renter's insurance must be presented to Landlord and a copy placed in Tenant's lease file, prior to Tenant's occupancy.

Tenant acknowledges that property or liability insurance maintained by Landlord may not protect against loss or damage to Tenant's personal property or belongings or cover Tenant's liability for loss or damage caused by the actions of Tenant or any occupant of the Unit. Tenant also acknowledges that by not maintaining a policy of personal liability insurance, he/she may be personally liable to others, including, if applicable, Landlord, for loss or damage caused by the actions of Tenant or any occupant in the Unit. Tenant further acknowledges receipt of notice from Landlord requiring Tenant to maintain a policy of personal liability insurance, which provides limits of liability to third parties in an amount not less than $100,000 per occurrence. Tenant agrees to maintain, at Tenant's sole expense, during the Term of the Lease and any subsequent renewal periods, a policy of personal liability insurance satisfying such requirements. This liability insurance does not protect Tenant against loss or damage to Tenant's personal property or belongings-only a renters' insurance policy does this. If Tenant fails to maintain active personal liability coverage or to provide Landlord with proof, in the form of a declaration page, of that coverage, Tenant will be opted-into tenant liability coverage administered by Landlord. In such case Tenant will reimburse Landlord for the cost of the tenant liability and any additional fees that may apply in the monthly rent payment as an additional charge.

**XI. USE AND ASSIGNMENT/SUBLETTING.** Tenant agrees that the Premises shall be used only as a dwelling unit and for no other purposes. Tenant agrees that neither the Premises nor any part thereof shall be sublet or assigned, nor shall the number or name of occupants be increased or changed, without written consent of Landlord.

**XII.    TENANT'S DUTIES/RULES AND RESTRICTIONS:** Tenant agrees that Tenant, at all times during this Lease Term, shall: (a) keep the Premises safe and sanitary; (b) dispose of all rubbish, garbage, and other waste in a clean, safe and sanitary manner approved by Landlord; (c) keep the Premises free of insects, rodents, vermin and other pests; (d) not permit objectionable odors to emanate or to be dispelled from the Premises; (e) keep all plumbing fixtures in the Premises in a clean and sanitary condition; (f) use and operate all electrical and plumbing fixtures properly; (g) comply with the requirements of all applicable state and local housing, health and safety codes; (h) refrain, and forbid any other person who is on the Premises with Tenant's permission, from intentionally or negligently destroying, defacing, damaging or removing any fixture, appliance, or any other part of the Premises; (i) maintain in good working order and condition any range, refrigerator, washer, dryer, dishwasher, microwave, garbage disposal or other appliances supplied by Landlord; (j) promptly notify Landlord of the need for repairs in the Premises; (k) conduct, and require other persons on Premises with

*CP*

their consent to conduct, themselves in a manner that will not disturb the "peaceful enjoyment" of any other residents or guest of the Apartment Community; (l) not unreasonably withhold consent for Landlord or Landlord's agents to enter the Premises; (m) pay for any damage resulting from misuse of the Premises or any of the common elements in the Apartment Community; and (n) conduct, and require all persons on the Premise with Tenant's consent to conduct, themselves so as not to violate any state or municipal laws or regulations which relate to the use or possession of controlled substances on the Premises or the Apartment Community.

Tenant agrees, at all times during this Lease Term, to abide by the following rules and regulations: (i) no rubbish or garbage shall be kept outside Tenant's Premises for any period of time; (ii) toilets and water apparatus shall not be used for any purpose other than that for which they are constructed; (iii) yards, sidewalks, halls, passages and stairways shall not be obstructed by any of Tenant's personal possessions or used by Tenant for any other purposes than those of ingress and egress to and from Tenant's Premises; (iv) neither Tenant nor any of Tenant's guests or invitees go upon the roof of any building for any conditions or reason whatsoever; (v) floors, doors, and windows reflecting or admitting light into passageways or elsewhere in the building shall not be covered or obstructed by Tenant; (vi) no signs, awnings, screens, antennas, advertisements or notices shall be placed or fixed upon any part of the building, outside, or inside, nor shall any articles be suspended outside the building or placed on the window sills; (vii) Tenant shall not do or permit anything to be done in the Premises, or keep anything in the Premises which will in any manner increase the chance of fire or the rate of fire insurance; (viii) no additional electric or gas lights, pipes, wires, fireplaces or fixtures shall be installed or changed or in any way altered; (ix) (if applicable to premises) children under the age of sixteen (16) are not permitted in the swimming pool area, fitness center or business center except when accompanied by parent or other adult; (x) (if applicable to premises) use of the swimming pool area, fitness center or business center shall be subject to all Rules and Regulations established by Landlord from time to time; (xi) Tenant shall not use any electrical appliance that will interfere in anyway with the radio or television reception of other occupants of the Apartment Community; (xii) no hose shall be connected to water pipes, spouts or spigots and used for outdoor sprinkling, showering, pools, or washing of cars; (xiii) washing of vehicles is strictly prohibited; (xiv) Tenant shall be

Landlord's property; (xvi) Tenant shall not park any vehicle in a manner which shall block another vehicle or parking space; (xvii) parking in areas designated "NO PARKING", in front or beside yellow marked curbs, in fire lanes, across parking lines, on restricted streets, on the lawn, sidewalks, or blocking trash dumpsters is strictly prohibited; Any vehicle parked in violations of these rule vehicles will be towed at Tenant's expense; (xviii) no unlicensed or immobile vehicles, vehicles with broken windows, or flat tires are permitted to be parked in the Apartment Community; (xix) no boats, campers, trailers and other vehicles of similar type are permitted to be parked in the Apartment Community; (xx) no maintenance or repair work shall be allowed on vehicles located in the Apartment Community; (xxi) any Tenant who shares a driveway with an adjacent unit shall be prohibited from parking or permitting any guests, invitees or occupants from parking any vehicle in a manner which blocks ingress and egress to adjacent garages; and (xxii) such other rules and regulations established from time to time by Landlord provided that Landlord gives Tenant notice of such rules and regulations. Notice by electronic communication, newsletter, mailing or posting on community board shall be deemed sufficient notice of the establishment of such rules and regulations. In addition to being a default under this Lease, violations of any of the rules concerning the use or parking of vehicles in the Apartment Community will cause such vehicle to be towed away or removed at the expense of Tenant. Landlord reserves the right to designate no parking areas on the driveways in Landlord's sole and absolute discretion.

**XIII.    CONDITIONS OF PREMISES AND ALTERATIONS.** Tenant accepts the Premises AS IS, except as otherwise indicated on the inventory and condition form described below. Landlord makes no implied warranties. Landlord shall provide an inventory and condition form to Tenant on or before move-in. Within forty-eight hours (48) after move-in, Tenant shall note all defects or damages on the form and return it to Landlord's agent; otherwise the Premises shall be presumed to be in clean, safe and good working condition. Tenant shall use customary diligence in care of the apartments and common areas. Whenever damage is caused by Tenant, Tenant's guests, invitees or occupants due to carelessness, misuse, neglect, or failure to notify Landlord of any need for repairs, Tenant agrees to pay (1) the cost of all repairs and do so within seven (7) days after receipt of Landlord's demand for the repair charges; and (2) rent for the period the Premises are damaged whether or not the Premises are habitable. Tenant may not perform any repairs, painting, wallpapering, carpeting, electrical changes, or other alterations to Premises except as authorized by Landlord in writing. No holes or stickers are allowed inside or outside the Premises; however, a reasonable number of small nail holes for pictures hanging are permitted. No water furniture, antennas, additional phone or TV cable outlets, alarm systems, or lock changes, additions, or re-keying shall be permitted except by Landlord's prior written consent. Tenant shall not disable, disconnect, alter or remove Landlord's property, including security devices, alarm systems, smoke detectors, appliances, furniture, screens or window covering (mini-blinds). When Tenant moves in, Landlord shall furnish light bulbs for fixtures furnished by Landlord; thereafter light bulbs of the same wattage shall be replaced at Tenant's expense. Upon termination of this Lease, whether by lapse of time or otherwise, Tenant shall surrender to Landlord possession of the Premises, including the appliances, fixtures, and equipment contained herein, in a thoroughly clean condition, and in good order and repair, ordinary and normal wear and tear only excepted. Landlord is not required to rebuild or restore the Premises if said Premises becomes uninhabitable by reason of fire or other casualty caused by the negligence of Tenant, Tenant's guests, invitees or occupants.

4
CP

**XIV.    WHEN LANDLORD MAY ENTER.** Landlord or Landlord's representatives may peacefully enter the Premises during reasonable time for the purposes listed below, provided Tenant or Tenant's guests are present. If no one is in the Premises and Tenant has made request for repair and/or entry, Landlord, or Landlord's agents may enter peacefully and at reasonable times by duplicate or master key. If Landlord requests entry, a written notice shall be given to Tenant twenty-four hours (24) prior to entry. Landlord reserves the right to enter by other means if locks have been changed in violation of this Lease. Such entry may be for: repairs, estimating repairs or refurbishing costs; pest control; preventative maintenance; filter changes; testing and/or replacing smoke detectors; retrieving unreturned tools or appliances; preventing waste of utilities; delivering; installing; reconnecting; or replacing appliances, furniture, equipment, security devices, or alarm systems; removing or re-keying unauthorized security devices; or inspections when imminent danger to person or property is reasonably suspected; entry by a law enforcement officer with search warrant or arrest warrant; showing apartment to prospective Tenants (after vacating notice has been given); or insurance agents; or other valid business purposes.

**XV.    NON-LIABILITY.** Tenant acknowledges that any security measures provided by Landlord shall not be treated by Tenant as a guarantee against crime or a reduction in the risk of crime. Landlord shall not be liable to Tenant, Tenant's guests, invitees or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Landlord shall not be liable to Tenant, Tenant's guests, invitees or occupants for personal injury or damage or loss of personal property from fire, flood, water leaks, rain, hail, ice, snow, smoke, lightning, wind, explosion, or interruption of utilities unless caused by Landlord's negligence. Landlord has no duty to remove ice, sleet, or snow; but Landlord may do so in whole or in part, with or without notice. If Landlord's employees are requested to render services not covered in this Lease, Tenant shall hold Landlord harmless from all liability for same.

Tenant shall fully indemnify, hold harmless and defend Landlord from and against all claims, demands, actions, suits, damages, liabilities, losses, settlements, judgments, costs and expenses, whether or not involving a third party claim, which arise out of or relate to (1) any breach of any representation or warranty of Tenant contained in this Lease, (2) any breach or violation of any covenant or other obligation or duty of Tenant under this Lease or under applicable law, or (3) the intentional or negligent acts or omissions of Tenant, its invitees and permittees. Landlord recommends that Tenant consult an insurance agent or broker to obtain insurance in order to cover any liability that may arise under this section or elsewhere in this Lease.

**XVI.    LEASE COMPLIANCE.** Landlord and Tenant have, at all times, the right to require compliance with all covenants, terms and conditions of this Lease, notwithstanding any conduct or custom on Landlord's or Tenant's part in refraining from so doing at any time. Waiver at any time of

any breach or condition of this Lease shall not constitute or become a waiver of any subsequent breach, or change any condition of this Lease. Landlord, where not required by law, may discontinue any facilities, amenities, or such services rendered by Landlord and furnished to several Tenants on a common basis, not expressly covenanted for herein, it being understood that they constitute no part of the consideration for this Lease.

XVII.   **DEFAULT BY TENANT.** In the event Tenant fails (each occurrence being an "Event of Default") (a) pay Rent when due, (b) fails to perform any of Tenant's obligations under this Lease, (c) violates and/or fails to comply with any of the covenants, terms, or conditions of this Lease, the Apartment Community or any rule, regulation or policy herein or hereafter adopted by Landlord relating the Premises or the Apartment Community, or (d) it is determined by Landlord that Tenant provided any false information on the rental application, said default shall constitute grounds for termination of this Lease and/or eviction by Landlord. After the occurrence of an Event of Default, it is expressly understood and agreed that Tenant shall be and remain liable for all Rent and other charges due hereunder until this Lease expires or until such time as in the interim, the Premises are leased by another acceptable Tenant. Tenant shall also be and remain liable for any expenses incidental to cleaning, carpet cleaning, trash removal, painting, utilities, or any other damages or cost which Landlord has sustained by virtue of Tenant's use and occupancy of the Premises or default under this Lease. Failure of Tenant to pay Rent current until the last day of this Lease Term of this Lease or any renewal therefore, shall also make Tenant responsible for an agreed Five Hundred Dollars ($500.00) re-rental fee to cover administrative expenses anticipated in re-renting the Premises. All rights and remedies of Landlord herein enumerated shall be cumulative and none shall exclude any other right or remedy permitted by law.

XVIII.   **ENTIRE AGREEMENT.** This Lease and any attached Addenda are the entire agreement between Landlord and Tenant. No representations oral or written, not contained herein or attached hereto, shall bind either party, except any attached Addenda. Landlord or Landlord's agents (including management personal and other employees or agents) do not have authority to waive, amend or terminate this Lease or any part of it and do not have authority to make promises, representations or agreements which impose duties of security or other obligation on Landlord or Landlord's agents unless done in writing. No action or omission of Landlord's representatives shall be deemed a waiver of any subsequent violation, default, or time or place of performance.

*CP*

XIX.   **SEVERABILITY.** If any portion of this Lease is found to be void, unenforceable, or against public policy, the remaining portions of this Lease shall not be affected

XX.   **BINDING EFFECT.** This Lease is binding on Landlord and Tenant and on their respective heirs, successors, executors, and administrators. All Tenants under this Lease shall be jointly and severally liable for all obligations hereunder. The Consumer Sales Practices Act does not apply to this Lease.

XXI.   **SMOKE DETECTOR.** Tenant acknowledges that a UL listed smoke detector has been installed in the Premises. Tenant will test the smoke detector and determine that it is operating upon move in. Tenant agrees to inspect and test the smoke detector once each month. State law requires the occupant of the Premises (Tenant) to maintain any smoke detector on the Premises unless the occupant (Tenant) gives written notice to the owner (Landlord) that the smoke detector is not functional. Tenant shall not remove, tamper with or replace any part of the smoke detector. Tenant will notify Landlord or Landlord's agents of an inoperative smoke detector in writing. Landlord will not be responsible or liable for replacing or repairing an inoperable smoke detector until Tenant properly delivers such written notice. Landlord may charge Tenant a service charge if the service call results from Tenant's tampering, interfering, or damaging any components of the smoke detector. Tenant shall be liable for immediately paying the cost of repairing any damage caused to the smoke detector by Tenant's negligence or misconduct. Landlord shall not be responsible for any injury or damage to persons or property occurring in the Premises that in any manner arises from Tenant's failure to test, inspect or maintain the smoke detector as provided by this Paragraph. Tenant shall indemnify Landlord from any damage or liability caused by Tenant's failure to comply with this Paragraph. Any cost of replacing the smoke detector after Tenant vacates the Premises may, at Landlord's option, be deducted from Tenant's deposit. If any rules or provisions relating to the smoke detector are violated by Tenant, Tenant's guests, invitees or occupants, Landlord shall have all other rights and remedies set forth in PARAGRAPH XVIII - DEFAULT BY TENANT of this Lease, including damages, eviction and/or attorney's fees.

XXII.   **REGULATIONS/VACATING APARTMENTS AND SECURITY DEPOSIT PREREQUISITES.** A forwarding address must be given to Landlord prior to or upon surrendering the Premises. Upon surrendering the Premises, the Premises, garage and any storage units must be clean and orderly, all appliances must be clean and free of grease and food, refrigerators must be turned down to the number 1 setting, all trash and discards must be removed from the Premises and storage locker or garage and placed in the proper rubbish containers, all personal belongings must be removed, all windows and doors must be closed and locked, the carpet must be clean and free of dirt, stains, odors, pet urine, pet feces, pet hairs, and wax. If two or more people live in the Premises, and one leaves, there will be no refund of the Deposit as long as the Premises are occupied. Any personal items remaining in a Premises will be transported and stored for thirty (30) at a storage facility at Tenant's expense, plus a one hundred dollar ($100.00) handling fee. Landlord shall not be responsible for any loss or damage to any such items. After thirty (30) days, all such items shall be discarded at Tenant's expense. No Premises key, garage key, business center key or mail box key may be left in the possession of others. It is the responsibility of Tenant to deliver all keys to the property manager's office located at the Apartment Community.

attachments hereto to adjust for clerical errors or mistakes.

**CAUTION TO ALL PARTIES: THIS LEASE AND ALL ADDENDA ATTACHED HERETO, WHEN SIGNED BY ALL PARTIES, IS A BINDING LEGAL OBLIGATION. DO NOT SIGN WITHOUT FULLY UNDERSTANDING IT.**

The said Landlord and Tenant have executed this Lease in duplicate on the day and year first written above.

LANDLORD / AGENT:

By:

_____

██████ at ██████ LLC c/o Lifestyle
Property Management, Ltd.
230 West Street
Suite 200
Columbus, Ohio 43215

TENANT:

_____          ..................
██████ ██████                              Date

_____          ..................
                                          Date

 Gmail

## Fw: escape

**corina pierce** <corinampierce@yahoo.com>                        Sun, Oct 11, 2020 at 11:58 PM
Reply-To: corina pierce <corinampierce@yahoo.com>
To: BROAD JAMES <broadjamesdispatch@gmail.com>

Hello Happy Monday,

I am requesting a copy of all the photographs taken of my vehicle. Would you please forward the images to me via email on or before October 15, 2020? Also, I am still in need of a complete copy of my file with Broad & James Towing. Specifically, I would like a copy of the official notice that was sent to me (the owner) and any lienholder, inclusive of proof of service (return receipt)

Thank you,

Corina
404-547-1913
Sent from Yahoo Mail on Android

> On Mon, Sep 28, 2020 at 11:13 AM, BROAD JAMES
> <broadjamesdispatch@gmail.com> wrote:
>
> Nope ill get it ready for you.
>
>> On Mon, Sep 28, 2020 at 11:00 AM corina pierce <corinampierce@yahoo.com> wrote:
>> Thank you for responding. I am on my way now. Is there a specific time that works best for you?
>> Corina Pierce
>> 4045471913
>>
>> Sent from Yahoo Mail on Android
>>
>>> On Mon, Sep 28, 2020 at 7:58 AM, BROAD JAMES
>>> <broadjamesdispatch@gmail.com> wrote:
>>>
>>> Yes I can give you a copy of the letter on a letterhead, but if you want a copy of the file you will have to come into the office with a valid ID to get a copy for the Ford Escape do to privacy laws. Just let me know when you plan on stopping by and I will Have it ready for you.
>>>
>>> Broad & James
>>> 4301 E. 5th Ave
>>> Columbus, OH 43219
>>>
>>>> On Fri, Sep 25, 2020 at 4:51 PM corina pierce <corinampierce@yahoo.com> wrote:
>>>> Hi James,
>>>> Do you guys have letter head? Please write this information on company letterhead. As well could you address the letter to me:Corina Pierce
>>>> I am also requesting a copy of my entire file.
>>>> I need a copy of the letter that went to the meadows way address.
>>>> I also need the date that you contacted the DMV as well as a copy of your impound policy timeline...before you guys setup the scrapping process.
>>>> I also am requesting the date of intial towing and the amount owed. The gentleman I spoke to earlier today me that I could get the car for $1993.05....in which I was preparing to pay by Tuesday.
>>>> Please feel free to contact me if you have any questions.
>>>> 4045471913
>>>> Corina

*Ex. 2*

Sent from Yahoo Mail on Android

On Fri, Sep 25, 2020 at 2:27 PM, BROAD JAMES
<broadjamesdispatch@gmail.com> wrote:

**Broad & James Towing**
4301 E 5th Ave
Columbus OH 43219
Phone 614-231-8697
Fax 614-237-2310

**Broad & James Towing**
4301 E 5th Ave
Columbus OH 43219
Phone 614-231-8697
Fax 614-237-2310

**Broad & James Towing**
4301 E 5th Ave
Columbus OH 43219
Phone 614-231-8697
Fax 614-237-2310

To Whom It May Concern:

Broad & James impounded the 2008 Ford Escape at the request of the management of the property where it was parked.

Broad & James sent notices to both the owner & lienholder of the impound to the names and addresses furnished by the Ohio BMV from the vehicle title search.

No one claimed the vehicle. After the vehicle remained in storage for over 2 months, Broad & James filed for the title, then the vehicle was sent to the scrap yard.

BROAD AND JAMES TOWING

4301 E 5TH AVE

Columbus, OH 43219

PUCO#: 133356

REF# 534504

TITLEMAX OF OHIO INC

4757 W WEST BROAD STREET

COLUMBUS                    OH        43228

VIN ███████████              2008      FORD        ESCAPE

Towed From:                               Date Towed: 6-18-2020

4095 BROMLEY                              Value of Motor Vehicle: 875.00
HILLIARD, OH
                          **FIRST NOTICE**

This letter is to notify you that the above referenced vehicle has been towed by **BROAD AND JAMES TOWING** and is impounded at **4301 E 5TH Ave Columbus OH 43219.**

This vehicle will be declared a nuisance and disposed of in accordance with applicable laws of the State of Ohio (R.C. Section 4513.61) if not claimed within thirty (30) days from receipt of the signed returned receipt or notification of the delivery not being possible. Charges are $ 128.00 for towing, storage charges which accrue at $ 17.00 plus tax per day until the vehicle is claimed and a notification fee of $25.00. Total storage charges cannot be computed until the vehicle is claimed.

The storage charge will accrue daily until vehicle is released. If the owner disputes that the motor vehicle was lawfully towed, the owner may be able to file a civil action under section 4513.611 of the Revised Code. If the owner or lienholder fails to claim the vehicle, the towing service or storage facility may obtain title to the vehicle.

Attention Lien Holders:

The failure of the lien holder to exercise its rights to reclaim the vehicle within thirty (30) days of this notice constitutes a waiver by the lienholder of all right, title and interest in the vehicle and said lienholder consents to disposal of the vehicle as provided by law. Lien holder further appoints **BROAD AND JAMES TOWING** as agent to execute said release and any and all documents as may be required to dispose of vehicle.

**The owner or lienholder of the motor vehicle may reclaim this vehicle upon payment of expenses or charges incurred in its removal and storage, and presentation of proof of ownership, which may be evidenced by a certificate of title memorandum certificate of title to the motor vehicle.**

Registered owners name:              Lien holders name:

CORINA PIERCE                        TITLEMAX OF OHIO INC

6245 MEADOWS WAY                     4757 W WEST BROAD STREET

HILLIARD        OHIO  43026          COLUMBUS            OH    43228



Franklin County Ohio Clerk of Courts of the Common Pleas- 2020 Nov 06 2:26 PM-20CV007882



EX. 4

# OHIO DEPARTMENT OF PUBLIC SAFETY
## BUREAU OF MOTOR VEHICLES
# VEHICLE RENEWAL APPLICATION



**IF YOU NO LONGER OWN OR LEASE THIS VEHICLE, PLEASE DISREGARD THIS NOTICE.**

 **MAIL**
Allow 3 weeks (excluding mail time) to receive your registration. If address is incorrect, write the correct address in the spaces provided below. See instructions for completing this application. Checks or money orders are accepted.

 **INTERNET**
Log on to www.OPLATES.com. Some vehicles may be excluded from registering online (see web site for restrictions). Credit cards and electronic checks accepted. You may also change your address via this web site.

**DEPUTY REGISTRAR**
If any of the vehicle information on this form has changed, you must take your Certificate of Title to a deputy registrar. Most credit cards, cash, checks, or money orders are accepted.

**E✓CHECK**
E✓CHECK is still required biennially during the multi-year registration period for qualifying vehicles. If you have questions concerning EPA requirements, call 1-800-CAR-TEST or visit www.ohiocheck.org.

GJN2958 PC          SINGLE-OWNER

CORINA PIERCE
4294 BROOKLANDS DR
HILLIARD          OH   43026-1916

## Mail Renewal Instructions:

* Multi-Year registrations are available for two (2) to five (5) years. To request a revised renewal notice contact our office at 1-614-752-7800 or 1-800-589-8247.

* If you have an Amateur Radio, Commercial Radio/TV license plate, you must submit a copy of your unexpired and unrevoked FCC Radio and/or TV license at the time of the renewal.

* Lease Vehicles: If the Power of Attorney box below is marked YES, you must submit a Power of Attorney form signed by the lease company or your application will be returned to you unprocessed (photocopies accepted; originals not returned).

* EPA Counties: If the E✓CHECK box on the application is marked YES, your vehicle is subject to EPA emission testing. (NOTE: This box reflects your status at the time of printing. Testing done immediately before or after may change your status. You must enclose an OHIO issued E✓CHECK inspection Pass, Waiver or Exemption Certificate (photocopies accepted; originals not returned). E✓CHECK is still required biennially during the multi-year registration period for qualifying vehicles. If you have questions concerning EPA requirements, call 1-800-CAR-TEST or visit www.ohiocheck.org.

* Address change: If you have moved, this may result in a fee change due to differing local taxes. To verify your local taxes, or for any additional registration information, call 1-800-589-8247 or 1-614-752-7800.

* FEES: Make check or money order payable to: Ohio Treasurer of State. Your check must include your name and address; also print your license plate number on the check or money order. Online bill pay checks are not acceptable. DO NOT SEND CASH. Fees and all documents must be sent together or your application will be returned. Registration will be cancelled and a $15.00 penalty assessed for any check returned unpaid by the financial institution. NOTE: The fees shown are valid for mail registration only. You can receive the same service from a deputy registrar, phone, or internet, although fees may vary.

* To avoid the $10.00 late fee, renew within 30 days after your expiration.

* Donations: You may make donations to the children's Save Our Sight program by checking the box below and entering the amount you wish to donate ($1.00 increments). Add this to your total fees due. For more information on the children's Save Our Sight program, please call 1-800-755-GROW (4769).

| Vehicle Expiration date: 12/04/2019 | | |
|---|---|---|
| 2008 FORD SW     PLATE #: GJN2958 | | |
| RENEWAL FEES | | |
| REN PLATE FEE | | 8.26 |
| SPECIAL PLATE FEE | | |
| STATE LICENSE TAX | 31.00 | 31.00 |
| LOCAL/COUNTY TAX | 25.00 | 25.00 |
| RTEF TAX | | |
| SERVICE FEE | 3.50 | 3.50 |
| POSTAGE | 3.02 | .41 |
| MAIL-IN TOTAL | 70.77 | 59.91 |

You must sign below to complete the processing of your application

BMV 4603N 2/18 [17601146]

---

**APPLICATION FOR RENEWAL REGISTRATION BY MAIL**

| PLATE CAT. PASSENGER | PLATE # & TYPE GJN2958 |
|---|---|
| TITLE NO. 2512873370 | VEHICLE 2008 FORD SW |
| REG. EXP. 12/04/2019 | REN. EXP. 12/04/2020 |
| COUNTY FRANKLIN | TAX DIST./NAME 2512 HILLIARD |
| VIN | Seat Cap. 000   WGT |

POWER OF ATTORNEY REQUIRED?  NO

E✓CHECK REQUIRED?  NO

☐ Keeping current plates pay:          $59.91
☐ Requesting new plates pay:           $70.77
☐ Requesting new plates with
   current plate number pay:            $80.77

☐ I would like to donate $ ☐☐☐☐☐
to the children's Save Our Sight program.

CORINA PIERCE
4294 BROOKLANDS DR
HILLIARD          OH   43026-1916          GJN2958

*Ex.5*

I affirm that the drivers for licensees of leased vehicles now have insurance or other financial responsibility (FR) coverage covering this vehicle and will not operate or permit the operation of this vehicle without FR coverage, all previous registration fees have been paid, this plate category is correct and this vehicle will not be used as a commercial vehicle unless so registered.

SIGNATURE(S)                    DATE
X

Daytime Phone Number: (        )

Write name
or address
corrections
here: _____
      _____ County

BMV 4603N
2/16   D

4603N          1619230209050836

# IN THE FRANKLIN COUNTY MUNICIPAL COURT
## COLUMBUS, OHIO

Villages at Britton Ltd.
_____
Plaintiff,

v.

Corina Pierce
_____
Defendant.

CASE NO. 2020 CVG 21986
JUDGE DAVID B. TYACK

## ENTRY

Defendants Financial Disclosure/Fee Waiver Affidavit is not needed as detailed below.

Upon Motion of the Court, sua sponte, the Defendants Counterclaim is DISMISSED, as it requests an amount in excess of the monetary jurisdiction of the Court. Fee is waived.

Defendants Answer is accepted. This case shall proceed to hearing on the Complaint for Restitution.

Clerk to send notices.

IT IS SO ORDERED.

10/22/20
Date

JUDGE DAVID B. TYACK

EX 6

**THIS PAGE INTENTIONALLY LEFT BLANK**